UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DORIS BROWN, *individually and as Personal*
*Representative of the Estate of Ja'colby Duran*
*Brown, decedent*, et al.,

      Plaintiffs,

v.

CITY OF MUSKEGON, et al.,

      Defendants.

_____/

Case No. 1:16-cv-1166

HON. JANET T. NEFF

**OPINION AND ORDER**

Plaintiffs Doris Brown and Mary E. Barnes filed this civil rights case seeking damages for the deaths of their respective decedents, Ja'Colby Duran Brown and Dupree Jamar Johnson, who were fatally shot during an event at the Defendant Elks Lodge in Muskegon, Michigan, at which minors allegedly purchased and/or were allowed to consume alcohol. Pending before the Court is a Motion to Dismiss under FED. R. CIV. P. 12(c) (ECF No. 56) by Defendants City of Muskegon, Public Safety Director Jeffrey Lewis and City Clerk Ann Marie Cummings ("Municipal Defendants)."[1] Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court grants Defendants' motion.

---

[1] Defendants Elks (I.B.P.O.E of W. Charity Lodge #1397), John King, Derrick Taylor, Robert Roundtree, and Theodis Tucker have been dismissed; defaults have entered against the remaining Defendants Jethro Gay and Jamal Quinney.

# I. BACKGROUND[2]

Plaintiffs' Second Amended Complaint (SAC) alleges that on September 21, 2013, Defendant Elks Lodge #1397 ("Elks" or "club") was a liquor license holder and private club whose members, officers, agents, and/or employees permitted underaged minor patrons to enter the premises and purchase alcoholic beverages, including the decedents Brown and Johnson (the "decedents") who attended an event held at the Elks that evening (SAC, ECF No. 11, ¶¶ 19-27). During the evening, there were incidents of fighting and violence inside the Elks premises (*id.* ¶ 29). At no time did Elks representatives contact the local police; they instead merely attempted to control the rowdy crowd and escalating violence by turning the lights on and off and briefly stopping the music (*id.* ¶ 31). The continuous violence erupted when firearms were produced, causing the patrons to spill into the premises parking lot, but Elks representatives did not contact the police (*id.* ¶¶ 30-32).

Eventually, the violence escalated to the point that Elks representatives stopped the music and forced all patrons to immediately exit the club (*id.* ¶ 33). Despite knowledge of prior similar such incidents, Elks representatives still did not notify law enforcement of the circumstances (*id.* ¶¶ 32, 34). Witnesses and attendees at the event subsequently notified local law enforcement that shots were being fired into the crowd (*id.* ¶ 36). After being forced to leave the club, the decedents were immediately shot, and they were later found dead in the parking lot (*id.* ¶¶ 35, 37). The shooter is believed to have been Defendant Jamal Quinney, a minor who was permitted entry into the Elks and was served alcoholic beverages (*id.* ¶¶ 39-41).

---

[2] The factual background is taken from the allegations in Plaintiffs' Second Amended Complaint (SAC) (ECF No. 11). Plaintiffs' SAC contains numerous factual allegations, which are summarized here as pertinent to the Municipal Defendants' motion before the Court.

As to the Municipal Defendants, Plaintiffs allege that, knowing the history of violence and illegal activity at the Elks, the City of Muskegon should have and could have requested that the Michigan Liquor Control Commission (LCC) revoke the Elks license to sell alcoholic beverages and could have revoked the Elks business certificate of registration, but did not (*id.* ¶¶ 43-44). Plaintiffs' SAC sets forth numerous allegations in support of their contentions based on alleged events and circumstances at the time of the fatal shooting of the decedents and in the preceding years.

Plaintiffs allege that on the evening of September 21, 2013 and the early morning hours of September 22, 2013, local law enforcement, including Muskegon public safety officials, were seen riding past the Elks, parking within several hundred feet of the club, and observing a large crowd waiting to gain access to the Elks (*id.* ¶ 45); they were aware of the potential for violence, illegal activity, and ordinance violations that occurred on the Elks premises, but were not visually or physically present outside and/or near the club at 2:00 a.m., as is traditionally or customarily done to protect the safety and welfare of the public and business residents as contemplated by local ordinances (*id.* ¶ 46). The City repeatedly violated state law by failing to monitor its licensee's license when it knew and/or should have known of repeated local, state and/or federal law violations, and could have, but did not, utilize injunctive remedies to prevent the many complained of violations (*id.* ¶¶ 48-49).

It was not until October 9, 2013 that Defendant Director of Public Safety Jeffrey Lewis filed a request for the suspension of the Elks business certificate of registration, prompting Defendant City Clerk Ann Marie Cummings to subsequently suspend the certificate because the Elks was conducting "business in an unlawful manner or in such a manner as to constitute a breach of peace or to constitute a menace to the health, morals, safety or welfare of the public" (*id.* ¶ 53).

3

Lewis' request was based on police officers' response to the Elks on September 22, 2013 at approximately 2:15 a.m., where they found a large crowd, two individuals dead of gunshot wounds, a female victim who was shot and run over by a vehicle and later pronounced dead, and four other gunshot wound victims (*id*. ¶ 54).

The City knew or should have known prior to the issuance or re-issuance of the Elks business certificate of registration that the corporate entity was dissolved by the state in 2009 and the Elks tax exempt status was revoked by the Internal Revenue Service in 2012 (*id*. ¶¶ 51-52). The City knew and/or should have known that:

- its police officials, agents, and/or employees had repeatedly and "indiscriminately" responded to reports of fights outside the Elks at closing time, aggravated assaults and weapons offenses from 2003 to its closing after September 22, 2013 (*id*. ¶ 56);

- after repeated discussions with Elks membership/owners, the Elks was unwilling to take necessary steps to mitigate the violence and illegal activities (*id*. ¶ 58);

- the Elks was not in continuing compliance with all local, state and/or federal laws as a condition for issuance or re-issuance of its business certificate (*id*. ¶ 59);

- the Elks was causing local law enforcement problems to the degree that effective law enforcement in the City was impaired or unreasonably delayed and/or specifically denied to the African-American citizenry in the area of the Elks (*id*. ¶ 64); and

- the Elks had not legally purchased any liquor during the entire calendar year of 2013 in compliance with state law (*id*. ¶ 78).

Plaintiffs allege that Defendants Lewis and Cummings knew as early as August 12, 2013 that the Elks was in violation of the liquor license law when the club was open, operating and advertising for parties/events where alcoholic beverages were to be served (*id*. ¶ 79). From May

2013 to August 2013, the Muskegon police were dispatched to the Elks to respond to incidents of: shooting victims, evidence of gunshot fire, and a female victim assaulted in the premises (*id*. ¶ 73). A local business resident reported to Muskegon police that patrons from the Elks were shooting firearms outside the club and offered a video recording of the activity to the police, which they refused to accept or review (*id*. ¶ 74). The same business resident on September 16, 2013 reported illegal and/or suspicious criminal activity at the Elks to Muskegon police officials, including complaints of unlawful parking of patron vehicles, but Muskegon police told local tow-truck drivers to "stand-down" and not tow cars off the private business property (*id*. ¶ 75). Just prior to the shooting death of the decedents, a local business resident, after lodging another complaint about illegal activity at the Elks was told to stop complaining about the Elks "(because it was a black club, in an isolated area) and to 'let them kill themselves'" (*id*. ¶ 76).

Plaintiffs' SAC further alleges that from 2003-2012, Muskegon police received at least 346 911 calls/dispatches regarding incidents at the Elks (*id*. ¶ 81); from 2007-2013, they received 62 police reports (*id*. ¶ 82); and from 2010 to September 22, 2013, they investigated at least 43 criminal incidents ranging from disorderly conduct to murder at the Elks (*id*. ¶ 83). In 2013 alone, Muskegon police received/prepared at least 16 incident complaint reports of illegal activity, including 2 misdemeanor assaults; 2 hit and run traffic crashes; a disorderly conduct; an intimidation/stalking complaint; 3 weapons/felony assault complaints; a lost property complaint; 2 operating while intoxicated complaints directly related to drinking at the Elks; 2 trespass and smoking marijuana on the licensed premises; a citizen assist (had been drinking); a medical related assist; 2 liquor control inspections; a malicious destruction of property; a larceny from a motor vehicle; 2 murder victims; a fatal crash (victim ran over and killed); and four felonious assault complaints (*id*. ¶ 84).

Notwithstanding all of the continued violations, the City, through its officials, agents, representatives and/or employees, including Defendants Lewis and Cummings, issued or renewed the Elks business certificate of registration in 2010, 2011, 2012 and 2013 (*id.* ¶¶ 66-69).  Not until after the deaths of the decedents did the City revoke the Elks business certificate of registration and move to petition the LCC to revoke the Elks on-premises liquor license (*id.* ¶¶ 71-72).  The Municipal Defendants knew or should have known that the Elks and its members or officers were clearly breaching the public peace and that the criminal incidents and violation of administrative ordinances and local, state and/or federal law constituted a public nuisance and jeopardized the general health, welfare and safety of the public, as well as the local business residents/owners (*id.* ¶ 85).  The Municipal Defendants performed their job duties in such a reckless manner that they had complete disregard for whether any further injury would occur to the general public at large, including but not limited to Plaintiffs/the decedents (*id.* ¶ 86)

Plaintiffs' SAC (ECF No. 11) alleges four counts:  Count I, 42 U.S.C. § 1983 – Unconstitutional Policies, Practices and Customs as to Municipal Defendants; Count II, Gross Negligence, Misconduct of Defendants Lewis and Cummings; Count III, Wrongful Death; and Count IV, Violation of 42 U.S.C. § 1981 – Municipal Defendants.  The Municipal Defendants move for dismissal under Federal Rule of Civil Procedure 12(c), for judgment on the pleadings, on the ground that the allegations in Plaintiffs' SAC fail to state any cognizable claims against these Defendants outside of the immunities afforded by federal and Michigan law.

## II.  ANALYSIS

### A.  Motion Standard

A motion seeking dismissal under Rule 12(c) is reviewed under the same standards as a motion under Federal Rule of Civil Procedure 12(b)(6).  *Vickers v. Fairfield Med. Ctr.*, 453 F.3d

757, 761 (6th Cir. 2006).  Rule 12(b)(6) authorizes the court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted[.]"  FED. R. CIV. P. 12(b)(6).  In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, the complaint must present "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.

### B. Discussion

The Municipal Defendants argue that Plaintiffs have the burden to plead plausible claims against them that avoid Defendants' immunities, and that Plaintiffs have failed to do so.  In the context of federal claims, "[w]hen a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermoore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).  In the context of Michigan state-law claims "a plaintiff must plead in avoidance" of a defendant's state-law "governmental immunity." *Mack v. City of Detroit*, 649 N.W.2d 47, 51, 57 (Mich. 2002).  Plaintiffs accept these pleading requirements, but disagree that they have failed to plead plausible claims that avoid the defense of immunity.

### 1. Federal Claims

"'Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *Taylor v. Barkes*, ___ U.S. ___, ___, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. ____, ____, 132 S. Ct. 2088, 2093 (2012)). "'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id*. (quoting *Reichle*, *supra* (brackets and internal quotation marks omitted)). "'When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.'" *Id*. (quoting *Ashcroft v. al–Kidd*, 563 U.S. ____, ____, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted)).

Qualified immunity involves a two-part inquiry. First, the court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "Second, if a plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.* A court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

#### a. Insufficient Claims Generally

As an initial matter, as the Municipal Defendants point out, Plaintiffs' 45-page SAC is not a model of clarity with regard to the allegations against the particular defendants. Plaintiffs' federal claims, Count I, referencing 42 U.S.C. § 1983, and Count IV, referencing Equal Protection of the Law under 42 U.S.C. § 1981, merely refer to the "Municipal Defendants" with no differentiation. Count I alleges Defendants' failure to "properly train, supervise, develop and

implement policies and procedures," and that the conduct of each Defendant "officially sanctioned policies, ordinances, regulations or customs of Defendants" (ECF No. 11 at PageID.257-258). Since such language is ordinarily invoked to state a claim against a municipality, it is unclear how the individual Defendants Lewis and Cummings are intended to be addressed.

In any event, Plaintiffs allege no specific conduct of either Lewis or Cummings to establish a claim against them under § 1983. "To state a cognizable claim against an individual under § 1983, 'a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law.'" *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (footnote omitted)). "Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior." *Heyerman*, 680 F.3d at 647.

To the extent Plaintiffs intend to allege the Municipal Defendants are liable based on the general responsibilities of Lewis or Cummings, § 1983 liability cannot be premised solely on a theory of respondeat superior, or the right to control employees. *See id.* A plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. *Id.*; *see also Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008) ("'[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983'" (quoting *Monell v. Dep't of Soc. Serv*s., 436 U.S. 658, 694 (1978)).

In Count IV, the SAC relies on 42 U.S.C. § 1981(a) and (c), as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Count IV thereafter alleges that Plaintiffs were subjected to intentional discrimination because of their race when Defendants abrogated their duties and responsibilities as officials assigned to protect the health, general welfare and safety of its citizenry, including the African-American Plaintiffs, by repeatedly ignoring clear and unambiguous local and state laws regarding the Defendant Elks business certification registration application materials; failed to conduct reasonable investigations and/or inquiries into the veracity of the Elks registration application materials; failed to follow-up on the legitimate criminal complaints lodged by concerned citizens; failed to revoke, suspend, and/or seek other injunctive or available relief to ensure the Elks would be closed to prevent further harm to the public; and that "but for" Plaintiffs and the Elks being a "black club" in a "black isolated area" and owned and patronized exclusively by "black citizens," Defendants ignored "all the plethora of violations and reasonably foreseeable harms" that could result and instead condoned the violence and criminal activity, resigned to simply "let them kill themselves" (*id*. at PageID.267-268, emphasis omitted).

As in Count I, Plaintiffs' SAC falls far short of alleging any specific conduct of the particular Defendants to establish liability.  Further, the Municipal Defendants point out, and Plaintiffs do not dispute, that Plaintiffs' action for damages cannot be maintained under § 1981.

*Arendale*, 519 F.3d at 598-99 ("'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units'"; "no independent cause of action against municipalities is created by § 1981(c)") (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) (footnote omitted)). Plaintiffs fail to allege facts that otherwise establish a violation of the § 1981 proscription requiring that all persons "shall have the same right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens …."

### b. State Created Danger Theory

Despite the general shortcomings in pleading substantive claims under § 1983 and § 1981, in their Response, Plaintiffs again do not address the specific counts in the SAC or specific claims as to the separate Municipal Defendants.  Plaintiffs instead provide lengthy argument on their general contention that they have stated plausible, cognizable federal-law claims against Defendants that would be an exception to a qualified immunity defense under a state-created danger theory.  Plaintiffs state that "[t]he defendants['] conduct as alleged herein, did create a state sponsored danger, making the decedent plaintiffs more vulnerable to harm than they would have otherwise been and that said actions/inactions caused their constitutional rights to be violated (substantive due process right not to be murdered by a private actor) as well as the life/bodily integrity/personal security, liberty and pursuit of happiness pursuant to the clearly established Fifth Amendment right) *where a government actor aided, abetted, collaborated, assisted or conspired with a private actor to accomplish said harm*" (ECF No. 57 at PageID.519, emphasis in original).

Even disregarding Plaintiffs' failure to properly allege their claims against particular Defendants, which alone dooms their SAC, Plaintiffs' reliance on the state-created danger

11

exception proves ill-fated.  Plaintiffs still fail to establish a constitutional violation on the part of Lewis or Cummings so as to defeat their qualified immunity as government officials.

While the state generally has no affirmative duty to protect its citizens from private acts of violence, it may be found liable under a state-created danger theory based on affirmative acts by the state that either create or increase the risk that an individual will be exposed to private acts of violence.[3] *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065-66 (6th Cir. 1998).  Because many state activities have the potential to increase an individual's risk of harm, plaintiffs alleging a constitutional tort under § 1983 are required to show "special danger" such that the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large.  *Id*. at 1066.  Thus, "[t]o show a state-created danger, [a] plaintiff must show: 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff."  *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (citing *Kallstrom*, 136 F.3d at 1066).

Plaintiffs fail to allege conduct that satisfies these requisites.  First, while Plaintiffs acknowledge that liability under a state-created danger theory requires affirmative acts, rather than a mere failure to act as Plaintiffs have generally alleged here in the failure to revoke the business registration certificate or to request revocation of the liquor license, Plaintiffs attempt to recharacterize the Municipal Defendants' failures to act as an affirmative act of legally sanctioning

---

[3] Plaintiffs do not allege a "special relationship" that would otherwise provide an exception to this general rule.

the Elks as a safe place for the decedents to visit or frequent.  The Court is not persuaded by this recharacterization.  Thus, the first prong of the state-created danger test is not met.

Nor is the Court persuaded that the second prong of the state-created danger test is met. Plaintiffs assert that the Municipal Defendants held the Elks out to the general public "as being *safe, healthy, inspected, and in compliance* with all the local/state/federal laws, thus "creating a class of potential plaintiffs" with a higher risk than the general public at large based on "the invited Elks patrons' mere physical presence at the Elks" (ECF No. 57 at PageID.526-527).  As the Municipal Defendants point out, there is no basis in the allegations of Plaintiffs' SAC to establish that either Lewis or Cummings created or increased any risk of harm to the decedents as identifiable individuals, as opposed to the public at large.

Finally, Plaintiffs assert nothing more than general, conclusory allegations that Lewis and Cummings "knew or should have known" that the Elks Lodge license should have been revoked but failed to act because the persons endangered by events at the Elks were "black."  Plaintiffs allege racially motivated comments, apparently by an unidentified Muskegon police officer, but as Defendants point out, there is no allegation connecting such alleged comments to the Municipal Defendants or showing that Defendants Lewis and Cummings had any knowledge of such statements.

The cases on which Plaintiffs rely do not support a state-created danger claim under the circumstances pled.  For example, in *McQueen v. Beecher Community Schools*, 433 F.3d 460, 467-68 (6th Cir. 2006), the court found that although a special danger was created when the teacher left five children in a room alone with an armed classmate, the teacher's act of walking out of the classroom could not be characterized as an overt act of danger-creation.  Thus, the plaintiff failed to show an affirmative act that created or increased the risk of private violence to the student fatally

shot; nor had the plaintiff shown that the risk of the attack was so obvious that the teacher had to have known about it. *Id.* at 465-66, 470. Likewise here, Plaintiffs fail to show an affirmative act that created or increased the risk to the decedents as opposed to the public at large.

The Sixth Circuit has repeatedly recognized that far more often than not, it has rejected § 1983 liability under a state-created danger theory. *See id.* at 464-65 (citing cases); *Jones v. Reynolds*, 438 F.3d 685, 688 (6th Cir. 2006) ("when a claimant argues that government officials failed to prevent private individuals from causing another injury, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 [] (1989), and its progeny rarely permit the claim to go forward").

The circumstances pled here are aligned with those cases in which state-created danger liability has not been supported. *See Jones v. City of Carlisle, Ky*., 3 F.3d 945, 947-48, 950 (6th Cir. 1993) (city had no § 1983 liability for injuries the plaintiff suffered in an auto accident caused by an epileptic driver prone to uncontrollable seizures, where the city allowed him, a known epileptic who was involved in a least seven auto accidents in the city, to maintain a driver's license, and failed to report the prior accidents to the state as required, so that his license would have been revoked; "while [the driver] was a definite danger behind the wheel of a motor vehicle, he was no more a danger to [the injured plaintiff] than to any other citizen on the City streets"). *See also Jones v. Reynolds*, 438 F.3d at 688, 691, 696 (city police officers' failure to stop an illegal motor vehicle "drag race," and expressly allowing it to proceed, did not amount to affirmative act and did not *specifically* place the spectator, who was struck and killed, at risk of danger).

Under this precedent, there was no clearly established constitutional obligation that would require Defendants Lewis or Cummings to pursue revocation of the Elks Lodge licenses or to provide police presence or intervention at the Elks Lodge event for the benefit of Plaintiffs or their

14

decedents.  Absent a constitutional violation by the individual city officers, Defendants Lewis and

Cummings, Defendant City of Muskegon cannot be held liable.  *Vereecke v. Huron Valley Sch.*

*Dist.*, 609 F.3d 392, 403-04 (6th Cir. 2010).  Accordingly, as the Municipal Defendants argue,

Plaintiffs' allegations in the SAC fail to establish plausible claims against under § 1983 (Count I)

or § 1981 (Count IV), and likewise fail to overcome a qualified immunity defense.  The Municipal

Defendants are entitled to dismissal of these claims.

### 2.  State Law Claims

Plaintiffs' state law claims in the SAC fail for similar reasons.  Plaintiffs' SAC alleges

claims under Michigan law for "gross negligence" (Count II) and "wrongful death" (Count III).

### a.  Wrongful Death

As an initial matter, Defendants argue that Plaintiffs' Count III fails because, in and of

itself, "wrongful death" is not an independent cause of action under Michigan law.  Rather,

Michigan's "wrongful death" statute, MICH. COMP. LAWS § 600.2922, is essentially a "filter"

through which an otherwise recognized tort claim (e.g., negligence or assault and battery) must

proceed, when the injury caused by that underlying tort is death.  *Wesche v. Mecosta Cty. Rd.*

*Comm'n*, 746 N.W.2d 847, 856 (Mich. 2008); *Simpson v. Alex Pickens, Jr. & Assocs., MD, PC*,

874 N.W.2d 359, 363 (Mich. Ct. App. 2015).  Plaintiffs do not dispute this contention.  Therefore,

the only cognizable state-law claim asserted against Lewis and Cummings is the underlying "gross

negligence" claim, Count II.

### b.  Gross Negligence

Under Michigan's Governmental Tort Liability Act (GTLA), MICH. COMP. LAWS

§ 691.1401 *et seq.*, governmental employees acting within the scope of their authority in the course

of their governmental employment are immune from state-law tort liability unless their conduct

rises to the level of "gross negligence" that was the proximate cause of the injury or damage. MICH. COMP. LAWS § 691.1407(2)(c); *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999). The Municipal Defendants argue that Plaintiffs' gross negligence claim fails under Michigan law; thus, Lewis and Cummings are entitled to governmental immunity.

First, there is no dispute that the alleged conduct of Lewis and Cummings occurred within the scope of their employment and authority as officials of the City of Muskegon and involved a "governmental function." Plaintiffs allege that Lewis and Cummings had authority in the course of their employment with the City of Muskegon, to pursue the actions with regard to the Elks Lodge licensing and provision of police protection. In the context of the GTLA, a "governmental function" encompasses any activity "that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." MICH. COMP. LAWS § 691.1401(b). Under this broad definition of the GTLA, the actions of city officials to grant, deny, investigate and/or revoke a government license (e.g., a liquor license or business registration and permits) must, by definition, be "government functions." Furthermore, "[i]t is well established in Michigan that the management, operation and control of a police department is a governmental function." *Mack*, 649 N.W.2d at 57.

The remaining question is whether the alleged conduct rises to the level of "gross negligence." For purposes of the GTLA, "gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MICH. COMP. LAWS § 691.1407(8)(a). Such "gross negligence" must be "the one most immediate, efficient and direct cause" of a plaintiff's injury, not merely "a" cause. *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (Mich. 2000).

Defendants assert that nothing in the allegations of Plaintiffs' SAC suggest that Lewis or Cummings acted in a "reckless manner" or that the action (or inaction) of Lewis or Cummings was "the one most immediate, efficient and direct cause" of injury to Plaintiffs and their decedents. The allegations indicate that the one most immediate, efficient and direct cause of injury in this case was the alleged shooting of Plaintiffs' decedents by Jamal Quinney. Defendants therefore argue that Lewis and Cummings cannot be held liable for "gross negligence" as defined by the GTLA. Since Lewis and Cummings retain their governmental immunity against those claims, Plaintiffs' state-law claims against Lewis and Cummings fail.

Plaintiffs provide no countervailing substantive argument. Instead, in their Response Plaintiffs state that as part of Count II (gross negligence claim), they allege "inadequate training/supervision in its vetting/investigation process as it relates to issuing/reissuing certificates of business registration to actual qualified entities" (ECF No. 57 at PageID.531). Thus, "Plaintiffs need to show a reckless disregard or deliberate indifference in the inadequacy of the training/supervision program in order to establish the requisite 'causal connection between omissions in the City's compliance enforcement/registration of business licensees and affirmative misconduct by individual officials in a particular instance[']" (*id*.).

Plaintiffs assert that additional discovery is necessary so that they can "attempt to succeed" on their failure-to-train/supervise and gross negligence claims where they are required to show that the municipality acted intentionally, recklessly, or with gross negligence (*id*., citing *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (the respondent would have to identify a particular deficiency in the training program and prove that the identified deficiency was the actual cause of her constitutional injury)). Plaintiffs state the Sixth Circuit has long held, and it is well established, that the plaintiff must receive "a full opportunity to conduct discovery" to be able to successfully

17

defeat a motion for summary judgment (ECF No. 57 at PageID.531, quoting *Ball v. Union Carbide Corp.*, 385 F. 3d 713, 719 (6th Cir. 2004)).  Plaintiffs argue that the Municipal Defendants' motion to dismiss based on qualified immunity should be denied as premature where discovery has not commenced.

The Court finds no justifiable basis for discovery on the record before the Court, and Plaintiffs provide nothing, not even speculation, as to what potentially would be discovered to salvage their claims under the circumstances presented.  A party claiming that dismissal of his claims should await the close of discovery has the burden to demonstrate why discovery is necessary.  *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004).  "Bare allegations or vague assertions of the need for discovery are not enough." *Id*.  Discovery may not be used as a "fishing expedition" in a quest for a claim.  *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 320 (6th Cir. 2017).  Plaintiffs' gross negligence claim is properly dismissed.

### III. CONCLUSION

For the foregoing reasons, the Municipal Defendants are entitled to dismissal of Plaintiffs' claims against them.  Accordingly:

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 56) is GRANTED.

**IT IS FURTHER ORDERED** that defaults having entered against Defendant Jamal Quinney (ECF No. 19) and Defendant Jethro Gay (ECF No. 33), Plaintiffs shall, not later than August 14, 2018, submit documents necessary to obtain default judgment against Defendants Quinney and Gay, after which judgment will enter as to all claims and Defendants in this case.

Dated:  July 31, 2018                                    /s/ Janet T. Neff
                                                        JANET T. NEFF
                                                        United States District Judge

18